968 P.2d 1090

STATE of Idaho, Plaintiff–Respondent,

v.

Edward Grove COTTRELL,
Defendant–Appellant.

No. 24110.

Court of Appeals of Idaho.

Nov. 25, 1998.

Featherston Law Firm, Sandpoint, for appellant.

Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent.

SCHWARTZMAN, Judge.

## I.

## FACTS

On January 6, 1997, at approximately 3:00 p.m., Edward Grove Cottrell was involved in a fight with one of his co-workers. Cottrell broke a beer glass and used it to slash his victim's face. The victim sustained severe facial lacerations which required numerous stitches and reconstructive surgery.[1]

At about 10:30 p.m. on the same day, J.L. stopped at a gas station to fill her truck's gas tank. Cottrell approached her and after asking where she was headed, indicated that he was going in the same direction. Cottrell asked if she would give him a ride and J.L. assented. Once the two were in her truck, Cottrell requested J.L. to take him in another direction and offered her gas money to do so. Although uncomfortable, she again assented. As they traveled Cottrell identified himself as "Ryan." J.L. later stated that during this drive she noticed he smelled of alcohol.

Cottrell told J.L. that he wished to go to a local hotel where he was staying with his wife. Nonetheless, as they approached the parking lot of the hotel he changed his mind, explaining that he wanted to have a beer. J.L. then drove him to a gas station down the street from the hotel, but Cottrell didn't go inside. Instead, he again changed his mind and asked her to drive to a friend's trailer. J.L. agreed to this request and drove down a road behind the gas station. When they reached the trailer Cottrell did not get out of the truck. J.L. told him that she wanted to go home, but Cottrell told her to drive him back to the gas station. J.L. was unsure of the way back, so Cottrell gave her directions. However, instead of directing her back to the

---

1. This appeal involves two separate cases which were resolved by a common plea agreement. Although the defendant appeals from the denial of his Rule 35 motion filed in response to his sentences for both crimes, the record on appeal does not include the district court record for this case.

station, he told her to stop the truck on a side-road.

Cottrell and J.L. sat on the side-road with the motor running and the parking lights on. As the dashboard lights illuminated the truck cabin, he informed her that he was going to masturbate and promptly took his pants off. He then moved across the truck to sit next to J.L., putting his arm behind her. When he told her to masturbate him, J.L. informed Cottrell that she was uncomfortable and wanted to leave. Cottrell responded by attacking J.L. First, he grabbed her hair. Then he seized her hand and informed her that she was going to stay with him, and that it would only take a minute. Cottrell placed J.L.'s hand on his penis and she acquiesced, hoping to end the attack. When he leaned over and forced his tongue into her mouth, J.L. pushed him away. Cottrell pulled her hair again and told her that she was going to do this.

Cottrell kissed J.L., put his hands inside her shirt, and touched the outside of the crotch of her jeans. Finally, he said, "this isn't working," and told her to take her jeans down. Despite J.L.'s continued protests, Cottrell unfastened her pants and compelled her to pull them down. Cottrell then subjected her to a series of non-consensual sex acts and physically forced her to perform fellatio upon him. Finally, he let go of her hair and asked J.L. to climb onto his lap. J.L. explained that she first had to remove her pants which were wrapped around her ankles. When Cottrell allowed her to do so, J.L. grabbed her keys, opened the truck's door, jumped out and ran screaming to the nearest trailer.

At first, the couple living in the trailer didn't believe J.L.'s story. Nonetheless, she was able to convince them that she had in fact been raped and needed assistance. As she stood on the porch of the trailer waiting for the couple to get dressed, Cottrell wandered by, headed towards the gas station. The couple came outside and provided her with a pair of pants and some shoes. Because their trailer did not have a telephone, they walked with J.L. to the gas station so that she could call her parents.

As J.L. stood inside the gas station Cottrell approached her and asked if she was okay. She turned away. The woman from the trailer asked if J.L. wished to call the police. Cottrell overheard and answered for her, announcing that he didn't think she wanted to. J.L. said she would just call her mother. Cottrell left the station, but returned a few minutes later and again asked J.L. if she was okay. The station attendant became agitated and accused him of hurting J.L. Cottrell responded, explaining that they had been on a date and were hugging in his "rig" when she started screaming and left. Upset, J.L. began questioning him about who's car they had been in. Cottrell then left the gas station.

J.L.'s mother arrived at approximately 12:30 a.m. and called the police. J.L. was taken to the Sheriff's office where she provided the police with a description of her attacker. The officer informed her that the description she gave sounded like an individual the police had trouble with earlier in the day. J.L. was then taken to the hospital for treatment, but later returned to the Sheriff's office.

At approximately 3:30 a.m. on January 7, 1997, the investigating officer was informed that Cottrell's vehicle had been found at the trailer park, with the engine running and the lights on. Officers approached the vehicle and found Cottrell sleeping in the front seat. They woke and arrested him on a battery charge stemming from the fight that occurred earlier in the day. After being advised of his Miranda rights, Cottrell asked the officers if there was a girl with him. When asked if he had a girl with him, Cottrell stated that he thought he did and also told police that he had been drinking. The officers informed him that he was being investigated for rape, sodomy and possibly kidnaping. Cottrell then indicated that he had been with two women that night, stating that he had been with the woman they were referring to earlier in the evening, having given her a ride at approximately 5:00 p.m. He claimed, however, that he had come to the trailer park with another woman. Cottrell admitted that he had requested sex from the first girl and that she had "went off" on him

and run away screaming. He also recounted how she had run to a trailer for help and then walked to the gas station to call the police. Following these admissions, Cottrell was transported to the Sheriff's station.

J.L. was sitting in the lobby of the Sheriff's office when she heard a voice say, "charging me with a felony?" J.L. turned to her mother and said "[t]hey got him." "It sounds just like him. I heard him." Her mother told her not to jump to conclusions. The mother then asked who the police had brought in and was told, in the presence of J.L., that the man had two names, Ed Cottrell and "Ryan something." Police then took J.L. into a jail cell where she could view the suspect. J.L. looked through a twelve-inch by twelve-inch window and first noticed two police officers. Cottrell was then placed in front of the window so that she could see his head and shoulders. J.L.'s first view of him was from behind, and then from the side. Although she didn't say so at the time, she admitted at the preliminary hearing that at first she was unsure if Cottrell was the same man that had attacked her. However, Cottrell then turned and looked into the small window, and as J.L. later recounted, "then he smiled and I knew it. I said, That's him."

## II.

### PROCEDURE

Cottrell was charged with both the sexual assaults on J.L. and the aggravated battery of his co-worker. Following a preliminary hearing, an information was filed charging him with two counts of rape in violation of I.C. § 18–6101(3), and two counts of an infamous crime against nature, I.C. § 18–6605. The aggravated battery charge was dismissed without prejudice and later refiled as a separate case.

Cottrell filed a motion to suppress J.L.'s identification of him, asserting that the show-up procedure violated his right to due process. He stated that the show-up procedure was so unfairly suggestive that it encouraged her to identify him even though she was actually unsure if he was the man who raped her. Although the district court determined

that the single-person show-up procedure was suggestive, it found that other factors rendered the identification reliable and denied the motion to suppress.

Prior to trial, the parties reached a plea agreement which resolved the rape and sodomy charges, as well as the aggravated battery charge. Cottrell entered a conditional *Alford* plea[2] to battery with the intent to commit rape, I.C. §§ 18–911, 18–6101, reserving his right to appeal the district court's denial of his motion to suppress the identification. Cottrell also entered an *Alford* plea to an amended charge of aggravated assault, I.C. § 18–905. He did not reserve the right to appeal any issues in that case.

Cottrell's sentencing hearing was held on July 11, 1997. For the offense of battery with the intent to commit rape, the court imposed a unified sentence of fifteen years, with ten fixed. On the aggravated assault charge, Cottrell received a fixed sentence of five years. The sentences were ordered to run concurrently. Cottrell filed a *pro se* Idaho Criminal Rule 35 motion for reduction of sentence which was denied by the district court.

Cottrell appeals the district court's denial of his motion to suppress his identification by J.L. He also appeals the district court's denial of his Rule 35 motion.

## III.

### THE TRIAL COURT DID NOT ERR WHEN IT DENIED THE MOTION TO SUPPRESS J.L.'S IDENTIFICATION OF COTTRELL

#### A. Standard of Review

When considering an appeal from the denial of a motion to suppress, an appellate court will not overturn a trial court's factual findings unless they are clearly erroneous. However, this court conducts a free review of the application of constitutional standards to the facts found. *State v. Bush*, 131 Idaho 22, 28, 951 P.2d 1249, 1255 (1997); *State v. Julian*, 129 Idaho 133, 135, 922 P.2d 1059, 1061 (1996). Under the restrained

---

2. *See North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

standard of clear error customarily applied to factual issues, a factual finding will not be deemed clearly erroneous unless, after reviewing the record, an appellate court is left with a definite and firm conviction that a mistake has been made. *State v. Bird,* 119 Idaho 196, 198, 804 P.2d 925, 927 (Ct.App. 1990); *State v. Curtis,* 106 Idaho 483, 490, 680 P.2d 1383, 1390 (Ct.App.1984).

**B. The Admission Of J.L.'s Identification Of Cottrell Did Not Violate Cottrell's Right To Due Process**

Cottrell invites this Court to adopt an approach in which single-subject show-ups would be a *per se* violation of a defendant's right to due process, and therefore, always suppressed. However, he has not presented any rationale to justify treating a single-person show-up differently than other identification procedures. The United States Supreme Court considered the *per se* approach in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), but found that it "goes too far since its application automatically and peremptorily, and without consideration of alleviating factors, keeps evidence from the jury that is reliable and relevant." *Id.* at 112, 97 S.Ct. 2243. Instead, the Court found that a totality of the circumstances analysis more appropriately served the interests involved in identification procedures. *Id.* at 113–14, 97 S.Ct. 2243. We agree. Consequently, we decline to utilize a *per se* approach, and instead apply the traditional analysis for determining whether the single-subject identification procedures employed in this case violate Cottrell's right to due process.

■ Reliability is the linchpin in determining the admissibility of identification testimony. *State v. Hoisington,* 104 Idaho 153, 161, 657 P.2d 17, 25 (1983), *citing Brathwaite,* 432 U.S. at 114, 97 S.Ct. 2243. The Idaho Supreme court recognized that the due process test for suppression of an in-court identification that is allegedly tainted by an impermissibly suggestive out-of-court identification is whether the out-of-court identification was so suggestive that there is a very substantial likelihood of misidentification. *Id.* This same test applies to the admissibility of out-of-court identifications as well. *Id.* at 162, 657 P.2d at 26. The Court went on to note that, under the above test there will not be a very substantial likelihood of misidentification as long as the identification possesses sufficient aspects of reliability. *Id.* at 161, 657 P.2d at 25. The central question is whether under the totality of the circumstances the identification was reliable, even though the identification procedure was suggestive. *Id.* at 162, 657 P.2d at 26, *citing Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Where the reliability of the identification is sufficient to outweigh the corrupting effect of the suggestive identification procedures, the admission of the identification will not violate due process. *Id.*

**1. The identification procedures employed by police were impermissibly suggestive**

■ The procedures utilized by police to facilitate J.L.'s identification of Cottrell were *clearly* suggestive. Prior to the show-up procedure, J.L. and her mother were informed that the man now in custody was named Ed Cottrell, but sometimes went by the name of Ryan. This disclosure to the victim, as she waited to view the suspect, was obviously suggestive, as it would serve to bolster the idea that the correct man had been arrested.

■ More importantly, instead of using a line-up procedure with a number of possible suspects from whom J.L. could identify her attacker, the police chose to display only Cottrell and two uniformed officers. Such single-person show-ups are inherently suggestive and cannot be condoned. *Hoisington,* 104 Idaho at 162, 657 P.2d at 26 (1983); *see also United States v. Wade,* 388 U.S. 218, 234, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ("It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police.").

Accordingly, we conclude that the identification procedures employed by the police to obtain J.L.'s identification of Cottrell were impermissibly suggestive and violated well-established constitutional precedent.

## 2. Under the totality of the circumstances the identification was reliable, even though the procedure was suggestive

■ This Court will next consider whether the identification possesses other indicia of reliability which outweigh and purge the corrupting influences of the impermissible suggestiveness. The established factors to be considered in determining whether an identification is constitutionally reliable include:

(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the identification; and (5) the length of time between the crime and the identification.

*State v. Buti,* 131 Idaho 793, 799, 964 P.2d 660, 666 (1998); *State v. Kysar,* 116 Idaho 992, 995, 783 P.2d 859, 862 (1989).

■ The district court found that J.L. had numerous opportunities to view Cottrell prior to, during and after the crime. She first saw him at the gas station where he approached her. Then, as she drove he sat within inches of her in the passenger seat of her truck. Prior to the attack, Cottrell moved across the truck seat, placing himself immediately next to her. He then proceeded to sexually assault J.L., during which time he kissed her, placing his face directly in front of her. J.L. testified that at this time the dash lights were on inside the truck. Furthermore, Cottrell twice approached her after the ordeal as she stood inside the gas station. Upon seeing him there, J.L. identified him as the attacker, and during the second of these confrontations, Cottrell himself stated that he had been in a vehicle with J.L. before she left screaming. Moreover, upon hearing him speak at the police station J.L. spontaneously exclaimed that his was the voice of her attacker. During this unplanned encounter in a less suggestive circumstance than the subsequent show-up, J.L. recognized and identified Cottrell's voice. We find that there was sufficient evidence to support the district court's finding that J.L. had ample time and opportunity to observe Cottrell's physical appearance and voice characteristics during the crime and immediately afterwards.

The court also found that J.L. would have had a high degree of attention focused on her attacker during the crime and afterwards when he approached her at the gas station. We concur. A victim of crime, as opposed to a casual observer, has more reason to be attentive to the circumstances and to an attacker's appearance. *State v. Bush,* 131 Idaho 22, 29, 951 P.2d 1249, 1256 (1997).

Next, the district court noted that although the physical description J.L. gave police was not thorough, it was accurate. The record reflects that J.L. described her attacker as having dark, shoulder length hair, dark eyes and weighing less than 200 pounds. Although she was unsure of his height, J.L. did identify the relative size of her attacker and also stated that she did not remember him as having any facial hair. While Cottrell's clothing, at the time of his arrest, did not match J.L.'s description, his physical features did. He had dark, shoulder length hair and other than a small five o'clock shadow, he did not have any facial hair. Based upon these facts we cannot say that the district court erred when it found that the accuracy of the description supported the reliability of the identification.

Although the district court noted her original hesitancy, it also found that J.L.'s identification of Cottrell was a "very concrete identification." This finding was based upon her emphatic statements at the show-up and her in-court identification. J.L.'s preliminary hearing testimony reveals that at the jail she initially viewed Cottrell from behind and was unsure if he was the attacker; so too when he turned and J.L. saw him from the side. However, he turned again and while directly facing her, smiled. At that point she said, "That's him." J.L. testified that this thought process occurred over a span of about five seconds. In his report the investigating officer noted that when J.L. was asked if she was sure, she stated that she was "positive." We regard the cautious manner in which J.L. approached this task, combined with her confident assertion, as further confirmation that the identification was reliable.

Finally, the district court found that the identification came only a few hours after the attack. The record shows that the show-up procedure occurred in the early morning hours of the day after the attack, a time when Cottrell's appearance was still fresh in J.L.'s mind. We therefore uphold the district court's finding that this extremely short length of time between the crime and the show-up support the reliability of the identification.

Accordingly, we find that notwithstanding the inherently suggestive show-up procedure utilized by police, the totality of the circumstances provides sufficient indicia of reliability to justify the admission of J.L.'s identification of Cottrell as the man that attacked her.[3] We therefore affirm the denial of Cottrell's motion to suppress his identification by J.L.

### IV.

### THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED COTTRELL'S RULE 35 MOTION

 A motion to reduce an otherwise lawful sentence is essentially a plea for leniency, and a decision on such a motion is vested within the sound discretion of the sentencing court. *State v. Wersland,* 125 Idaho 499, 504, 873 P.2d 144, 149 (1994); *State v. Lavy,* 121 Idaho 842, 845, 828 P.2d 871, 874 (1992); *State v. Hernandez,* 121 Idaho 114, 117, 822 P.2d 1011, 1014 (Ct.App. 1991). In reviewing the denial of a Rule 35 motion, we determine whether the trial court abused its discretion, applying the same standards that are used to evaluate the reasonableness of the original sentence. *State v. Shiloff,* 125 Idaho 104, 107, 867 P.2d 978, 981 (1994); *State v. Snapp,* 113 Idaho 350, 351, 743 P.2d 1003, 1004 (Ct.App.1987). Those standards are well-established and need not be repeated here. *See State v. Sanchez,* 115 Idaho 776, 777–78, 769 P.2d 1148, 1149–50 (Ct.App.1989); *State v. Toohill,* 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982). If

the original sentence was not excessive when imposed, the defendant must demonstrate that it is excessive in light of new or additional information presented with his motion to reduce. *State v. Springer,* 122 Idaho 544, 545, 835 P.2d 1355, 1356 (Ct.App.1992); *Hernandez,* 121 Idaho at 117, 822 P.2d at 1014. If a defendant fails to make this showing, we cannot say that denial of the motion represents an abuse of discretion. *Springer,* 122 Idaho at 545, 835 P.2d at 1356.

 At the sentencing hearing the district court properly considered the primary objective of protecting society and the related goals of deterrence, rehabilitation and retribution. *State v. Broadhead,* 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), *overruled on other grounds by State v. Brown,* 121 Idaho 385, 825 P.2d 482 (1992); *Toohill,* 103 Idaho at 568, 650 P.2d at 710. The district court found that Cottrell had an extensive criminal history which included other violent crimes. It also noted the violent nature of the crimes for which he was being sentenced, and the severe damage suffered by the victims. Although the court recognized that there was a possibility that Cottrell could change, it found that such change would not occur quickly. Based upon these considerations Cottrell was sentenced to fifteen years, with ten fixed, for the battery with the intent to commit rape, and five years fixed for the aggravated assault.

Cottrell's sentence was entirely reasonable when imposed and he has made absolutely no showing that it has become excessive in light of new or additional evidence. Cottrell has proven himself to be a dangerous criminal, and for the protection of society he must be deterred and incarcerated. The grave nature of his crimes illustrate the continuing threat Cottrell poses to the community. Therefore, we concur with the district court's determination that an extended prison sentence is warranted and find that the district court did not abuse its discretion when it

---

**3.** We note that Cottrell's statements to police fully corroborate the reliability of J.L.'s identification of him as the man she was with that evening. *See Mullen v. Blackburn,* 808 F.2d

1143 (5th Cir.1987) (noting that a defendant who admitted he was apprehended while committing a robbery effectively conceded the reliability of eyewitness identification).

denied Cottrell's Rule 35 motion for a reduction of sentence.

## V.

## CONCLUSION

Based upon the foregoing, the judgments of conviction and denial of Cottrell's Rule 35 motion are affirmed.

Chief Judge LANSING and Judge PERRY, concur.